**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPHANIE FOSTER, SOPHIE CAPSHAW-MACK, and OLGA OTKINA, *et al.*, *individually and on behalf of all others similarly situated*,           Plaintiffs <br><br>       v. <br><br> THE PROCTOR & GAMBLE COMPANY, <br>          Defendant. | No. 25 CV 9735 <br><br> Judge Jeremy C. Daniel |

**ORDER**

The defendant's motion to dismiss [48] is granted in part and denied in part. Specifically, it is granted as to the third cause of action, but it is denied as to all others. The defendant shall answer the complaint on or before July 31, 2026. The July 16, 2026, status hearing is stricken.

**STATEMENT**

**<u>Background</u>**

This case is before the Court on defendant The Proctor & Gamble Company's ("P&G") motion to dismiss Plaintiffs Stephanie Foster, Sophie Capshaw-Mack, Olga Otkina, Amanda Murray, Einaya Morciglio, Carmuse Mitchem, Stephanie Maya, Wendy Rodriguez, Dena Habboush, Lareina Green, and Katherine Vescovo's consolidated class action complaint ("CCAC"). (R. 48.) The facts below are drawn from the CCAC, (R. 32), and are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

P&G makes tampons and markets some under the brands Tampax Pearl and Tampax Radiant (the "Products"). (R. 32 ¶¶ 1–3.)[1] The Products' labels include certain statements about the Products, including: "#1 GYNECOLOGIST RECOMMENDED TAMPON BRAND," "FREE OF PERFUME," "FREE OF ELEMENTAL CHLORINE BLEACHING," "TAMPON FREE OF DYES," and "CLINICALLY TESTED GENTLE TO SKIN." (*Id.* ¶ 4.) The plaintiffs allege that these statements lead consumers to

---

[1] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

believe the Products to be free of potentially harmful ingredients or elements, namely lead. (*Id.* ¶ 5.) They also allege the statements are misleading and deceptive because they "omit[] and fail[] to disclose that the Products are contaminated with, or at the risk of being contaminated with, substantial levels of lead." (*Id.* ¶ 6.) Because, as they allege, consumers are concerned about lead consumption, these statements and omissions regarding the presence of lead are material. (*Id.* ¶¶ 90–92.)

The plaintiffs further allege that consumption of or exposure to lead in any amount is dangerous. (*Id.* ¶¶ 38–45.) The dangers are particularly acute when lead is absorbed directly into the bloodstream, which can occur through tampon use. (*Id.* ¶¶ 46–50.) The plaintiffs' counsel "conducted independent testing of the Products by established laboratories specializing in chemical analysis of consumer products." (*Id.* ¶ 53.) The lab tested "homogenous samples" of the Products, including tampons from boxes purchased personally by some plaintiffs, using an FDA-approved method for testing "the presence of heavy metals in food." (*Id.* ¶¶ 51–60.) The results show that "all sizes and varieties" of the Products "uniformly contain a substantial amount of lead," above the "EPA action level standard for lead in drinking water" and the maximum allowable dose level under California Proposition 65. (*Id.* ¶¶ 60–67.) As a result, the plaintiffs contend that they paid more for the Products than they would have, had they known the Products contained lead. (*Id.* ¶¶ 33–39.)

The plaintiffs bring causes of action under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA") (Count I), and a number of similar consumer protection acts from other jurisdictions (Counts II, V–XII). They also bring claims for negligent misrepresentation (Count III), unjust enrichment (Count IV), and breach of implied warranty (Count XIII). The named plaintiffs seek to represent three classes: a nationwide class; a class of citizens of the District of Columbia, Florida, Illinois, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, and New York; and a class of only Illinois citizens. (*Id.* ¶ 295.)

<u>Analysis</u>

The Court first notes that P&G submitted a notice of supplemental authority, (R. 63), attaching an article published in *Toxicological Sciences* regarding the health risks of metals in tampons. (R. 63-1.) P&G then filed a "request for judicial notice" of "a printout from the FDA's website" that summarizes the study. (R. 67; R. 67-1.) A court may take judicial notice of certain matters without converting a motion to dismiss into a motion for summary judgment. *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012). But this only applies to facts "not subject to reasonable dispute." *Mays v. Dart*, 974 F.3d 810, 824 (7th Cir. 2020) (citing Fed. R. Evid. 201(b)). While it cannot be reasonably disputed that the study is referenced on the FDA website, the veracity of the study and the conclusions reached therein may be subject to scientific debate and reasonable dispute. *See id.* (declining to take judicial notice of a CDC report because the content was not "incontrovertible" and was thus reasonably disputable).

P&G essentially asks the Court to weigh the evidence it submitted against the plaintiffs' allegations, which is improper at this stage. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022) (a Rule 12(b)(6) motion tests the sufficiency, not veracity, of allegations). Accordingly, the Court declines to take judicial notice of the study.

**Standing**

P&G contests the plaintiffs' Article III standing to sue. (R. 48 at 10–13.) While P&G does not raise its standing arguments under Rule 12(b)(1), that is how the Court understands them. *Bazile v. Fin. Sys of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). There are three components to standing: "an injury in fact that is concrete, particularized, and actual or imminent," "the injury was likely caused by the defendant," and "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). A facial challenge to standing, (*see* R. 48 at 10–13,) "tests whether the allegations, taken as true, support an inference that the elements of standing exist." *Bazile*, 983 F.3d at 279.

P&G argues the injury-in-fact element is lacking because the plaintiffs fail to allege that the Products "actually contain lead at levels that pose a potential health risk." (*Id.*) The plaintiffs allege that the Products uniformly contain "substantial" amounts of lead, the labels mislead consumers regarding the presence of lead, and that lead exposure in any amount poses a litany of health and safety risks. (R. 32 ¶¶ 38–67.) As a result, the plaintiffs claim that they paid more for the Products than they would have, had they known of the lead. (*Id.* ¶¶ 20–21.) This alleged financial harm confers standing. *See In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011). These allegations differ from those in the cases cited by P&G, which involved alleged defects that varied based on manufacturing site, time, or some other variable. (*See* R. 48 at 10–11.) Here, the plaintiffs allege a widespread defect impacting every Product. (R. 32 ¶¶ 60–67, 82.) P&G also argues that the plaintiffs do not identify a "scientific benchmark or threshold applicable to tampons." (R. 48 at 10.) Setting aside whether that is necessary, the plaintiffs have identified two thresholds and allege that the amount of lead in the Products exceeds both. (R. 32 ¶¶ 63–67.) Whether these are proper benchmarks is a factual question improper for resolution at this stage. P&G contends these arguments are also reasons the claims "fail on the merits." (R. 48 at 13.) Much of P&G's argument contests the veracity of the plaintiffs' claims regarding lead presence and its health risks, (*id.* ¶¶ 38–67,) but this fails because the Court must accept as true the plaintiffs' well-pled allegations at this stage. *Iqbal*, 556 U.S. at 678. And because the plaintiffs allege that consumers do not want to pay for the Products with lead (at least at the price they paid), the lead allegations sufficiently support a financial injury and a claim for relief at this stage.

P&G next argues that Foster, Morciglio, and Capshaw-Mack lack standing because the CCAC does not allege that the Products these three plaintiffs bought were tested.

(R. 48 at 12–13.) The plaintiffs' counsel tested leftover Products purchased by most named plaintiffs, and the results uniformly showed lead in all Products tested. (R. 32 ¶¶ 61–64.) One reasonable inference from these allegations is that the Products purchased by these three plaintiffs also contained lead. Further, as explained above, the plaintiffs plausibly allege that the Products are uniformly defective and that the label statements are also uniform. (*See, e.g., id.*) That is sufficient at this stage.

P&G also argues that the plaintiffs lack standing to pursue injunctive relief because they are now aware of the alleged misleading labels and the presence of lead. (R. 48 at 20.) To have standing to pursue prospective relief, the plaintiffs must allege an impending future harm. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014). On the one hand, plaintiffs must "demonstrate standing for . . . each form of relief that they seek." *TransUnion LLC*, 594 U.S. at 431. On the other, when there is "a live damages claim that will support injury-in-fact, further proceedings will be necessary, and that would be the best time to explore whether [she] also has standing to pursue any type of injunctive relief." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017) (deferring resolution of plaintiffs' standing to pursue putative consumer fraud class action until after the pleadings stage). Resolving this standing question at the pleadings stage is further complicated where class certification remains a possibility. *Id.* Because the primary issue at this stage is whether the plaintiffs have stated a claim, and further because class representation has not been established, the Court declines to foreclose the plaintiffs or any potential class from obtaining injunctive relief at this juncture. *See id.*

**Liability**

To survive dismissal under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. The motion tests the sufficiency of the plaintiff's claims, not the merits of her case. *Gociman*, 41 F.4th at 885. The plaintiff must provide "adequate factual detail to lift [her] claims from mere speculative possibility to plausibility." *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020) (citing *Iqbal*, 556 U.S. at 678). The Court "construe[s] all allegations and any reasonable inferences in the light most favorable to the plaintiff." *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 512–13 (7th Cir. 2020) (citation omitted). Further, for the plaintiffs' claims that sound in fraud, the plaintiffs must describe "the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011).

P&G first argues that the plaintiffs fail to allege that the label statements are misleading or that the labels omit material facts. (R. 48 at 13–17.) A reasonable consumer may be misled by either affirmative statements or omissions. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Whether a statement is misleading turns on "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be

misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020) (quoted source omitted). An omission on a communication from a defendant (such as a label) employed to mislead consumers may support a consumer fraud claim. *See, e.g., Raya v. Mead Johnson Nutrition Co.*, 758 F. Supp. 3d 819, 832 (N.D. Ill. 2024).

The plaintiffs' allegations regarding affirmative statements on the labels are well-pled. They allege that reasonable consumers trust manufacturers to sell lead-free tampons, believe the Products are lead-free, and that they would be misled by the statements that fail to disclose the presence of lead. (*See* R. 32 ¶¶ 79–115.) P&G's suggested meanings of the label statements offer one interpretation; they do not disprove the sufficiency of the plaintiff's allegations, nor do they render the plaintiffs' inferences fanciful or unreasonable. *Bell*, 982 F.3d at 481 (inquiries into the minds of reasonable consumers "are matters of fact, subject to proof that can be tested at trial"). P&G points out that some of the statements are true, but even literally true statements can be misleading. *Id.* at 479. At bottom, P&G's arguments contesting whether the labels are misleading get at the strength of the plaintiffs' claims, not the sufficiency of their allegations, so the Court rejects them. *AnchorBank, FSB*, 649 F.3d at 614 (quoted source omitted) ("The issue is not whether a plaintiff will ultimately prevail but whether [she] is entitled to offer evidence to support the claims.").

As to the omission theory, the plaintiffs plausibly allege that the presence of lead is important to consumers and that P&G knew of the lead in the Products but intentionally failed to disclose it. (R. 32 ¶¶ 8–9, 88, 124–33.) P&G's primary argument is that the plaintiffs fail to plead that P&G owed a duty of disclosure. (R. 48 at 16–17.) While a plaintiff must allege a duty to disclose to state a common law fraud claim, they need not allege as much to state a claim under ICFA or related consumer fraud laws. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571, 573–74 (7th Cir. 2012). P&G's argument that an omission regarding lead is not material is unconvincing. First, the plaintiffs have plausibly alleged that reasonable consumers do find it material because they care about lead exposure. (*Id.* ¶¶ 90–95.) Further, this argument poses an issue of proof, not of allegation, which is not properly resolved at this stage. *See Bell*, 982 F.3d at 481 (finding "no basis for disregarding [the] plaintiff's allegations . . . in deciding the motion[] to dismiss").

P&G next argues that the plaintiffs' second cause of action, which alleges violations of consumer protection statutes in ten jurisdictions, is insufficiently pled. (R. 48 at 17–18.) P&G argues that each state law "has different elements, standards, and requirements," but does not say what those differences are. (R. 48 at 17.) While there may be some variation, these laws are all based on the Federal Trade Commission Act and prohibit largely similar conduct. *See Bell*, 982 F.3d at 474–75; *see also Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972, 972 n.2 (7th Cir. 2020) (surveying state laws). The plaintiffs' claim puts P&G on notice of the challenged conduct, and in any event, Counts I and V through XII are individual claims under the laws of nine of those ten jurisdictions. (*Id.* ¶¶ 317–48, 382–478.) P&G next contends that the

claims under Minnesota and D.C. law should fail because no plaintiff is "within the class intended to be protected" by it. (R. 48 at 18.) This is an issue relevant to class certification, which the Court will decide once that issue becomes ripe. *See Slowinski v. BlueTriton Brands, Inc.*, 744 F. Supp. 3d 867, 880 (N.D. Ill. 2024) (employing the "prevailing view" of resolving this argument at the class certification stage). Last, P&G argues that the plaintiffs fail to meet Rule 9(b)'s heightened pleading standard. But as explained above, the complaint plausibly alleges the required details of the challenged conduct: P&G advertised the Products, made statements and omissions regarding lead, and the plaintiffs saw the labels and paid more for the Products than they otherwise would have. That satisfies Rule 9(b). *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019).

P&G next argues that the plaintiffs' negligent misrepresentation claim is barred by the economic loss doctrine. Generally, plaintiffs who experience a purely economic loss cannot recover in tort for that loss. *Wigod*, 673 F.3d at 567. However, at least in Illinois, an exception applies when the loss results from a "false representation" where there is an "extra-contractual duty between the parties." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011) (quoted source omitted). While the plaintiffs assert a "common law duty to accurately and truthfully label the Products," they do not cite any authority supporting the existence of such a duty. (R. 54 at 19.) Because the plaintiffs fail to point to an extra-contractual duty that P&G owes to the plaintiffs, the economic loss rule bars the plaintiffs' negligent misrepresentation claim. *Id.* (affirming dismissal of negligent misrepresentation claim where the plaintiff failed to "fashion" an extra-contractual duty).

P&G also argues that the plaintiffs' unjust enrichment claim must fail because its consumer fraud claims fail. (R. 48 at 19.) A "request for relief based on unjust enrichment is tied to the fate of" the consumer protection law claims. *Vanzant*, 934 F.3d at 740. Because the Court concluded above that these claims survive dismissal, it will not dismiss the plaintiffs' request for relief based on unjust enrichment. *Id.*

Last, P&G argues the plaintiffs' claim for breach of implied warranty is insufficiently pled and fails because it must be brought against a seller, not P&G (a manufacturer). (R. 48 at 19–20.) As to the former, P&G does not explain what element(s) the plaintiffs fail to plead, so the Court rejects the argument. As to the latter, P&G is correct that at least Illinois law generally requires privity of contract between parties before a plaintiff can recover damages for a breach of implied warranty. *See In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 806 (N.D. Ill. 2016). However, a plaintiff may nevertheless sue a product manufacturer (not the seller) if the plaintiff relied on the manufacturer's advertising or labeling of a product in deciding to purchase the product. *Id.* at 807. That is what the plaintiffs allege here, so the Court rejects P&G's argument. P&G also argues that the complaint fails to allege that the Products failed to perform their intended function. (R. 48 at 20.) But the CCAC alleges that tampons present safety risks due to the presence of lead, and

one reasonable inference from that is that the Products do not perform as intended. Accordingly, the Court will not dismiss this claim.


Date: July 15, 2026

JEREMY C. DANIEL
United States District Judge